UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re:<br><br>STEPHEN M. ROBINS,<br><br>              Debtor. | Chapter 7<br><br>Case No. 07 B 22753 (ASH) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| TRIBECA LENDING CORP.,<br><br>              Plaintiff,<br><br>   -against-<br><br>STEPHEN M. ROBINS,<br><br>              Defendants. | Adv. Proc. No. 07-8317A |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**WILSON, ELSER, MOSKOWITZ, EDELMAN**
  **& DICKER LLP**
**Attorneys for Plaintiff**
**By: David L. Tillem, Esq.**
**3 Gannett Drive**
**White Plains, NY 10604**

**ALTER, GOLDMAN & BRESCIA, LLP**
**Attorneys for Debtor**
**By: Bruce R. Alter, Esq.**
    **Dana P. Brescia, Esq.**
**55 Mamaroneck Avenue**
**Harrison, NY 10528**

**SILVERMAN ACAMPORA LLP**
**Attorneys for Chapter 7 Trustee**
**By: Anthony C. Acampora, Esq.**
    **Ronald J. Friedman, Esq.**
**100 Jericho Quadrangle**
**Suite 300**
**Jericho, NY 11753**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**MEMORANDUM DECISION GRANTING MOTION TO REARGUE**

Before the Court in this adversary proceeding (the "Adversary Proceeding") is a motion (the "Motion to Reargue") by plaintiff Tribeca Lending Corp. ("Tribeca") to reargue this Court's Order dated October 27 and entered October 31, 2008 (the "October 27 Order") which denied Tribeca's motion for a default judgment (the "Default Judgment Motion") against debtor-defendant Stephen M. Robins ("Robins"). The complaint in the Adversary Proceeding seeks a money judgment against Robins in the sum of $1,700,000 (or such other amount as is found to be due) and a determination that such debt is not dischargeable under Sections 523(a)(2), (4) and (6) of the Bankruptcy Code.

For the reasons set forth below, I have concluded that the October 27 Order was clearly erroneous for two separate and independent reasons and, if not reversed, would result in manifest injustice. Accordingly, the Motion to Reargue is granted. Upon reconsideration, the October 27 Order is vacated and Tribeca's Default Judgment Motion is granted.

**Jurisdiction**

The Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the July 10, 1984 order of reference to bankruptcy judges signed by Acting Chief Judge Robert J. Ward.

**Background**

**Events prior to bankruptcy**

In December 2006 Robins borrowed from Tribeca $1,700,000 pursuant to two promissory notes and two mortgages. The notes and mortgages were intended to create a first lien against Robins' real property in Scarsdale, New York (the "Property"). As to Robins, the mortgages were valid, subsisting liens against the Property.

However, unbeknownst to Tribeca, the mortgages were never recorded in the County Clerk's Office.

- 2 -

When he incurred his $1.7 million mortgage debt to Tribeca in December 2006 Robins was indebted to the Internal Revenue Service for $439,108 and to the New York State Department of Taxation and Finance for $1,189,728,[1] most if not all of which was priority debt and non-dischargeable.

Realizing that Tribeca's mortgages were not recorded, and after consulting bankruptcy counsel, Robins took actions which would have the effect of utilizing the value of the Property (which he had pledged to secure his $1.7 million debt to Tribeca) to pay off and thereby discharge his priority, non-dischargeable debts owed to the taxing authorities, leaving Tribeca with an unsecured claim to be paid at pennies on the dollar *pro rata* with Robins' other unsecured creditor claims aggregating $3,125,328.[2]

Robins sold his Property to a third party for $1,749,500 on July 20, 2007. Robins used some $392,783 of the proceeds to pay closing costs, attorneys' fees and certain creditors and remitted the balance of $1,356,717 to his bankruptcy attorneys, Alter, Goldman & Brescia, LLP.[3] No part of the proceeds was paid to Tribeca.

On August 8, 2007, eighteen days after the sale of the Robins' Property, Alter, Goldman & Brescia, LLP filed Robins' petition under Chapter 7 in this Court. Thereafter, the $1,356,717 (or, as stated in other court papers before me, $1,406,583) held by Robins' counsel was turned over to the Chapter 7 Trustee.

**Proceedings in bankruptcy**

Confronted with Robins' sale of the Property, his bankruptcy filing, the failure of its own agent to file the mortgages, and the consequences of its unexpected status as an unsecured creditor in

---

[1] Figures taken from Robins' Schedule E filed in his bankruptcy case may have been immaterially less in December 2006.

[2] The source of this figure is Robins' Summary of Schedules filed in his bankruptcy case.

[3] The source of these figures was the Stipulation of Settlement dated September 10, 2008, discussed below. These figures differ somewhat from figures appearing elsewhere in the submissions before me, but the differences are not material to the outcome of the Motion to Reargue.

- 3 -

Robins' Chapter 7 case, Tribeca filed a proof of claim for $1,591,423[4] and embarked upon a two-tiered strategy to try to recover some portion of its loss.

First, on November 5, 2007 Tribeca filed the Adversary Proceeding to deny dischargeability of Robins' $1.7 million debt under Sections 523(a)(2), (4) and (6). The claim under subsection (2) of Section 523(a) was based upon the fact that Robins submitted two written applications to Tribeca, both signed by Robins and dated December 8, 2006, purporting to list his assets and liabilities, both of which failed to list some fourteen debts aggregating $2,546,087 including his debts to the State and Federal taxing authorities. The claim under subsection (4) alleged that Robins' sale of the Property with intent not to pay Tribeca constituted "a fraudulent disposition of mortgaged property, a crime pursuant to New York Penal Law § 185.10." The claim under subsection (6) alleged that Robins' sale of the Property and use of the proceeds not to pay Tribeca but to pay and thereby discharge Robins' non-dischargeable debts to the taxing authorities constituted "a willful and malicious injury . . . to Tribeca and to the property interests of Tribeca."

The second strategy pursued by Tribeca was a motion (the "Case Dismissal Motion") filed in late January 2008 which sought three forms of relief: (i) dismissal of Robins' bankruptcy case for cause under Section 707(a) on the grounds of Robins' alleged bad faith conduct; (ii) imposition of an equitable lien pursuant to Section 105(a) against the proceeds of the sale of the Property held by the Chapter 7 Trustee; and (iii) joint trial of the issues raised by the Case Dismissal Motion and the Adversary Proceeding. The strategy underlying the Case Dismissal Motion was articulated in paragraph 14 of Tribeca's counsel's affidavit in support of the Motion to Reargue as follows:

> 14. While an unperfected mortgage lien is of limited value in the bankruptcy case, see 11 U.S.C. § 544, the lien - between Robins and Tribeca - is valid and subsisting outside bankruptcy. New York law is utterly clear on this issue. Thus, if this Court recognized the equitable lien, albeit likely voidable by the trustee in bankruptcy, once the case is dismissed, the lien would be viable against both Robins and the sale proceeds. Approximately $1,400,000.00 would have been recoverable by Tribeca.

---

[4] The reason for Tribeca's claim in this amount, rather than $1,700,000, is not explained in the papers before me.

- 4 -

**Proceedings in the Adversary Proceeding**

Robins moved to dismiss the complaint in the Adversary Proceeding. Tribeca opposed, and oral argument was held on March 12, 2008. The motion to dismiss the Adversary Proceeding was denied by order dated March 26, 2008. Robins' time to answer the complaint expired on April 7, 2008. No answer was filed.

On March 28, 2008 Robins' attorney, Bruce R. Alter, Esq., met with Tribeca's attorney at the latter's office and advised Tribeca's attorney that Robins would not contest the Adversary Proceeding and would consent to the non-dischargeability of the Tribeca debt. (Mr. Alter acknowledged the March 28 conversation in open court (*see* October 16, 2008 Transcript at 2).) Thereafter, in a letter to Tribeca's attorney dated August 4, 2008, Mr. Alter reconfirmed that Robins would not contest the Adversary Proceeding and would consent to the relief requested, including non-dischargeability. The August 4 letter stated:

> This is to confirm our conversation this afternoon where I advised you that the Debtor, Stephen M. Robins will not contest the relief sought in the above-entitled Adversary Proceeding. . . .
>
> He has therefore authorized me to consent to the relief sought in the Summons and Complaint, specifically, he consents to the non-dischargeable (sic) of the Tribeca claim in an amount to be determined in accordance with appropriate Bankruptcy Procedures.

There is no dispute that Mr. Alter's oral and written communications to Tribeca's attorney on March 28 and August 4 were known to and authorized by Robins.

On August 7, 2008 Tribeca filed a formal "Request for Entry of Default Under Federal Rules of Bankruptcy Procedure 7055(a) and Local Bankruptcy Rule 7055-2(a)," attaching as an exhibit Mr. Alter's August 4 letter and quoting the portion of the letter quoted above and concluding as follows:

> 9. Consequently, no answer or other response has been or will be served by the Defendant.
>
> 10. The time for the Defendant to move, answer or otherwise respond to the Complaint has expired.
>
> WHEREFORE, Plaintiff requests that the Clerk of the Court enter the Certificate of Default against the Defendant Stephen M. Robins in the form attached hereto as Exhibit E.

- 5 -

The Clerk of the Court docketed an Entry of Default on August 13, 2008.

On September 15, 2008 Tribeca filed its Default Judgment Motion with a hearing scheduled on October 16, 2008.

**Settlement of the Case Dismissal Motion**

Both the Chapter 7 Trustee and Robins opposed Tribeca's Case Dismissal Motion, and the return date was adjourned without date to permit joint discovery proceedings leading to a joint trial with the Adversary Proceeding. Following the August 4 letter from Robins' counsel reconfirming that Robins consented to a judgment of non-dischargeability on his debt to Tribeca and entry of Robins' default on the docket in the Adversary Proceeding on August 13, events occurred resulting in a full settlement of all issues between Tribeca and the Chapter 7 Trustee.

On August 18 and 19 the Chapter 7 Trustee filed three motions (the "Interim Distribution Motions") seeking interim distributions aggregating nearly $1 million out of the Robins' Property sale proceeds to the taxing authorities, the Trustee and her counsel. The return date of these Motions was September 10. Needless to say, the Interim Distribution Motions would undermine Tribeca's Case Dismissal Motion strategy. However, Tribeca believed it had achieved the objective of the Adversary Proceeding (non-dischargeability of its claim against Robins). Accordingly, it proceeded to settle its controversy with the Chapter 7 Trustee and, since the settlement would moot the Case Dismissal Motion, Tribeca agreed with the Trustee not to oppose the Trustee's Interim Distribution Motions.[5]

After Tribeca had agreed with the Trustee not to oppose the Interim Distribution Motions and the deadline to do so had passed, in the afternoon of September 9 Robins' attorney sent a fax to Tribeca's counsel advising that Robins had "'changed his mind' and wanted to contest the adversary proceeding." But Robins' attorney did not file a motion to vacate Robins' default. While Robins' coun-

---

[5] The Stipulation of Settlement between Tribeca and the Chapter 7 Trustee provided that within seven days after an order approving the settlement became final and non-appealable, the Trustee would pay Tribeca the sum of $25,000; Tribeca would withdraw with prejudice its Case Dismissal Motion; Tribeca's Proof of Claim would be reclassified and allowed as a general unsecured claim in the sum of $1,566,423.55 payable *pari passu* with other general unsecured creditors.

sel orally mentioned at the September 10 hearing that Robins wanted to change his mind about his default, there was no motion before the Court to decide with respect to the default.

Consequently, on September 10 the Court entered orders providing for interim distributions to the taxing authorities in the aggregate amount of $850,000, to the Chapter 7 Trustee in the amount of $48,456.01, and to the Trustee's counsel in the amount of $63,425.44.

On September 11 the Chapter 7 Trustee formally moved for approval of the Stipulation of Settlement with Tribeca, and on October 20 the Court signed the order approving it.

**Robins' repudiation of his consent to non-dischargeability**

Tribeca's consent to the Interim Distribution Motions and the settlement with the Trustee guaranteed that Robins' non-dischargeable debts to the taxing authorities would be substantially if not wholly paid out of the proceeds of the sale of his mortgaged Property held by the Chapter 7 Trustee.

Whether or not his success in achieving this objective was the motivation for his subsequent action, the fact is that after Tribeca had agreed to allow the Property sale proceeds to pay Robins' tax debt, Robins changed his mind and attempted to revoke his consent to non-dischargeability. On October 10 Robins' attorneys filed Robins' affidavit and a memorandum of law opposing the Trustee's Default Judgment Motion and seeking to vacate his default docketed on August 13. The purported grounds for this change of position were (i) that the only reason for his default was lack of funding to oppose the Adversary Proceeding and (ii) that late in August Robins showed an attorney friend the court papers in his Adversary Proceeding and the attorney friend said he would defend the Adversary Proceeding without charge. The affidavit and memorandum asserted that Robins had meritorious defenses to all three of Tribeca's claims under Section 523(a)(2), (4) and (6), similar to Robins' arguments in support of his previously denied motion to dismiss the complaint.

**The Court's ruling on October 16**

After oral argument on the Default Judgment Motion on the morning of October 16, the Court held a telephone conference with counsel for the parties in the afternoon on the same day. Focus-

ing on the desirability of resolving dischargeability issues on the merits, the Court denied the Default Judgment Motion. The following is the entirety of the Court's reasoning for denying the Motion:

> THE COURT: I have real misgivings about this entire factual background but I have concluded at the end of a good deal of thought that in this case the motion for a default judgment should be denied and the debtor should be given an opportunity to defend the adversary proceeding on the merits.

October 16, 2008 Transcript at 19.

The Court did not address the legal authorities on default, the fact that Robins' default was intentional with full knowledge of his putative defenses, the fact that Robins not only defaulted but twice authorized his attorney to represent to Tribeca's counsel orally and in writing that Robins **consented** to non-dischargeability of his debt to Tribeca, the implication of that consent under the principles of waiver and estoppel, or the prejudice inherent in Tribeca's consent to the Interim Distribution Motions and settlement with the Chapter 7 Trustee in reliance on Robins' affirmative consent to non-dischargeability.

Tribeca filed the instant Motion to Reargue on November 6. Shortly thereafter counsel for the parties were advised that the Court would grant the Motion to Reargue and would reconsider the oral ruling on October 16 and the October 27 Order denying the Default Judgment Motion.

### Discussion

**I.  Legal authorities on vacating a default**

When a party has defaulted in a legal proceeding and later seeks to vacate its default, the Court is always confronted with important competing policy considerations.

On the one hand, our system of justice seeks to resolve disputes on the merits after each side has had a full and fair opportunity to present its case on the facts and the law. Since the discharge for the "honest but unfortunate" debtor lies at the heart of bankruptcy, courts are understandably reluctant to deny discharge or dischargeability without determining the merits because of technicalities or excusable neglect, especially where the creditor has suffered no material or legally cognizable prejudice.

On the other hand, it is essential that rules governing the conduct of litigation be enforced in the interest of predictability, finality, the even-handed application of the law and the integrity of the legal process. A rule ceases to have any force or efficacy if courts routinely excuse compliance and there is perceived to be no material consequence for default or other violation. Parties should not be permitted to default or otherwise violate legal requirements as a legal strategem and then be relieved of the consequences to another party's prejudice when the strategic objective has been achieved.

To resolve these competing considerations fairly, consistently and predictably, courts have established rules by which attorneys and their clients may be guided. Federal Rule of Civil Procedure Rule 55(c), made applicable to adversary proceedings in bankruptcy by Bankruptcy Rule 7055(c), allows courts to set aside an entry of default for "good cause," and Rule 55(c) permits courts to set aside a default judgment in accordance with Rule 60(b) of the Federal Rules of Civil Procedure.

Courts consistently evaluate "good cause" in the context of vacating an entry of default by considering three factors: (1) whether the default was willful; (2) whether vacating the default would prejudice the adversary; and (3) whether a meritorious defense is presented. *See, e.g.*, *Cyril v. Neighborhood P'ship II Hous. Dev. Fund, Inc.*, 124 Fed. Appx. 26, 27 (2d Cir. 2005); *SEC v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998); *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993); *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1138 (2d Cir. 1987); *Rafter v. Fleet Boston Fin. Corp.*, 2004 U.S. Dist. LEXIS 14605, at *6-7 (S.D.N.Y. July 28, 2004).

**Willfulness**

The willfulness prong of the "good cause" analysis is a subjective inquiry which "effectively distinguishes those defaults that, though due to neglect, are excusable, from those that are not." *Rafter v. Fleet Boston Fin. Corp.*, 2004 U.S. Dist. LEXIS 14605, at *1 (quoting *American Alliance Ins. Co., Ltd. v. Eagle Ins. Company*, 92 F.3d 57, 61 (2d Cir. 1996)). Willfulness "encompasses conduct that is deliberate or egregious or is carried out in bad faith." *Hernandez v. La Cazuela de Mari Rest., Inc.*, 538 F. Supp. 2d 528, 532 (E.D.N.Y. 2007); *see also American Airlines Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 60-61 (2d Cir. 1996). When a default is a strategic choice or part of a litigation tactic, the willfulness

element is easily satisfied.  *See, e.g., Hernandez v. La Cazuela de Mari Rest., Inc.*, 538 F. Supp. 2d at 532-34 (finding default to be willful where defendants' conduct was part of a "wait-and-see" litigation tactic); *American Alliance Ins. Co.*, 92 F.3d 57, 60 (2d Cir. 1996) (noting the Second Circuit's refusal to vacate judgment where the moving party made a "strategic decision to default").  For example, in affirming a bankruptcy court's finding of willfulness, the United States District Court for the Southern District of New York held that where parties "had made a conscious decision not to allocate funds" to defend a particular case, the default was a strategic choice and was deemed "willful."  *Gaglio v. Silverman (In re Suprema Specialties, Inc.)*, 330 B.R. 40, 52 (S.D.N.Y. 2005).

There can be no doubt that Robins' decision to default was deliberate and strategic.  Indeed, at oral argument Robins' attorney did not dispute this Court's classification of the default as "absolutely, intentional willful," "tactical," and "egregious."  *Transcript* at 2-3.  (Court: ". . . why don't you respond to the reply; basically that the default was willful which it clearly was.  Absolutely, intentional willful."  Robins' attorney:  "Yes, sir.").

While it is easy to assume the worst of Robins' conduct — that Robins' change of heart with respect to defending this case was an intentional, calculated part of a deceptive litigation strategy — it is not necessary to prove such bad faith.  For purposes of determining willfulness, it is enough that Robins made the conscious, strategic decision to concede non-dischargeability.  As in *Gaglio*, where the defaulting party "made a conscious decision not to allocate funds" to defend, Robins asserts that he chose to default for precisely the same reason.

Courts have held that, regardless of the other two elements of the "good cause" test, a default should not be set aside when it is found to be willful.  *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991) ("A default should not be set aside when it is found to be willful").  Therefore, this element alone is enough to justify refusal to vacate the default.  *See Hernandez v. La Cazuela de Mari Rest., Inc.*, 538 F. Supp. 2d at 534 ("Despite any meritoriousness of an anticipated defense, a default judgment should not be vacated if the default was willful, which this court finds is the case here").

However, for the sake of thoroughness, I will briefly address the two other considerations, prejudice and meritorious defense.

### **Prejudice**

The second prong of the "good cause" analysis for vacating default is prejudice to the party seeking default. To be considered prejudicial, vacatur of a default must result in tangible harm beyond mere delay, such as loss of evidence, discovery obstacles, or increased opportunities for fraud and collusion. *See, e.g., Louis Vuitton Malletier v. Barami Enters.*, 2006 U.S. Dist. LEXIS 5331, at *17 (S.D.N.Y. Feb. 14, 2006); *Rafter v. Fleet Boston Fin. Corp.*, 2004 U.S. Dist. LEXIS 14605, at *9-10 (S.D.N.Y. July 28, 2004); *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (citing C. Wright, A. Miller and M. Kane, Federal Practice and Procedure § 2699, at 536-37).

The prejudice that Tribeca would suffer far exceeds harm associated with mere delay. Specifically, in reliance on Robins' clear and repeated statements of intent not to defend the complaint, Tribeca abandoned its Case Dismissal Motion and consented to the Interim Distribution Motions based on Robins' consent to non-dischargeability. *See* point II, following. The prejudice to Tribeca is self-evident and mandates denial of Robins' attempt to vacate his default.

### **Meritorious Defense**

Finally, courts consider whether the party seeking to vacate the default has presented a meritorious defense. "The test of such a defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense." S*oloSpar, Inc. v. Equinox Fitness Ctr., Inc.*, 1998 U.S. Dist. LEXIS 8602, at *8 (S.D.N.Y. June 2, 1998); *see also Rafter v. Fleet Boston Fin. Corp.,* 2004 U.S. Dist. LEXIS 14605, at *11 (S.D.N.Y. July 28, 2004); *SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998); *Enron Oil Corp.*, 10 F.3d at 98.

Robins' proposed meritorious defenses do not meet this standard, at least as respects Tribeca's claim under Section 523(a)(2) that Robins' application for his $1.7 million borrowings in December 2006 did not disclose more than $2.5 million liabilities including the non-dischargeable debts to the taxing authorities. In his affidavit opposing the Default Judgment Motion Robins asserts in para-

graphs 24 and 25 that the application was prepared by Tribeca and that he changed it in certain respects (*see* paragraph 25). But he does not assert that he disclosed the $2.5 million in liabilities, and he does not deny that he signed the financial statement which omitted these liabilities. Tribeca's claim under subsection (4) of Section 523(a) may be more problematic. But it is by no means clear that Robins could successfully defend Tribeca's claim under subsection (6) of Section 523(a), since the facts are clear that Robins intentionally, with full knowledge of the consequences to Tribeca and the choice to pay the Property sale proceeds to Tribeca and wait ninety days to file bankruptcy, chose to convert to his own benefit the sale proceeds of his Property which he had mortgaged to Tribeca.

In any event, there is no dispute that Robins knowingly and intentionally both defaulted and affirmatively consented to dischargeability of his debt to Tribeca. He did so with full knowledge of his purported defenses to the complaint, all of which were argued to the Court in Robins' motion to dismiss. Under the case law, Robins has not shown "good cause" to vacate his conscious and deliberate default.

## II.    The principles of waiver and estoppel

As noted above, we are not concerned here solely with Robins' default in failing to file an answer to the complaint when it was due on April 7, 2008. In addition, Robins' attorney affirmatively represented to Tribeca's attorney orally on March 28 and again orally and in writing on August 4 that Robins **consented** to non-dischargeability of his debt to Tribeca. Having obtained not only the docketed entry of Robins' default and, more important, written confirmation that Robins affirmatively consented to non-dischargeability, Tribeca then consented to the Trustee's Interim Distribution Motions and the Stipulation of Settlement, thereby abandoning its Case Dismissal Motion strategy to recover the Property sale proceeds and, as a consequence, guaranteeing to Robins that the sale proceeds would be used to discharge his non-dischargeable debts to the taxing authorities.

These facts implicate the related doctrines of waiver and estoppel. A waiver is an intentional relinquishment of a known right. *See, e.g.*, *United States v. Johnson*, 391 F.3d 67, 75 (2d Cir. 2004), citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (defining waiver as an "intentional relinquish-

ment or abandonment of a known right or privilege"); *In re Frank Santora Equipment Corp.*, 256 B.R. 354, 370 (Bankr. E.D.N.Y. 2000) ("[a] waiver is the voluntary and intentional relinquishment or abandonment of a known existing legal right . . ."); *Northport Marina Assocs. v. J.M. Cashman, Inc.* (*In re Northport Marina Assocs.*), 146 B.R. 60, 63 (Bankr. E.D.N.Y. 1992); *In re Highland Financial Corp.*, 216 B.R. 109, 116 n. 6 (Bankr. S.D.N.Y.1997); *City of New York v. State*, 40 N.Y.2d 659, 669, 389 N.Y.S.2d 332 (1976) (under New York law, a waiver is "'the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it'" (citation omitted)).

The doctrine of equitable estoppel is closely related to the concept of waiver. "Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *Eastern Air Lines, Inc. v. Insurance Company of Pennsylvania* (*In re Ionosphere Clubs, Inc.*), 85 F.3d 992, 999 (2d Cir. 1996) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996) and *Marine Transportation Services Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1138 (11th Cir. 1994)). "Equitable estoppel is proper where the enforcement of rights of one party would create injustice to the other party who has justifiably relied on the words or conduct of the party against whom estoppel is sought." *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 462 F.3d 87, 94 n. 3 (2d Cir. 2006) (citation omitted). "'Broadly speaking, the essential elements of an equitable estoppel, as related to the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons, and (3) knowledge, actual or constructive, of the real facts. With respect to the party to which representations have been made, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance in good faith upon the conduct or statements of the party to be estopped, and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming to [sic – should read "the"] estoppel to his detriment.'" (footnote omitted). *In re Texaco Inc.,* 254 B.R. 536, 560-61 (Bankr. S.D.N.Y. 2000) (quoting 12 Am.Jur.2d, Bills and Notes § 554 (1997) and citing *Sequa Corp. v. Christopher* (*Matter of Christopher*),

28 F.3d 512, 520 (5th Cir. 1994); *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 n. 4 (5th Cir. 1990); *In re Car-Gill, Inc.*, 125 B.R. 133, 137-38 (Bankr. E.D.Pa. 1991)). *See also*, *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001) ("Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe the other party will rely upon it; 2) and the other party reasonably relies upon it 3) to her detriment." (citations omitted)); *In re WorldCom, Inc.*, 362 B.R. 96, 114 (Bankr. S.D.N.Y. 2007) ("The elements of equitable estoppel are material misrepresentation, reasonable reliance, and provable damages.") (citing *Bennett v. United States Lines*, 64 F.3d 62, 65 (2d Cir. 1995)); *In re Zarro*, 268 B.R. 715, 722 (Bankr. S.D.N.Y. 2001) ("Under New York law, a party invoking equitable estoppel must show (1) a misrepresentation or concealment of fact, (2) the knowledge or expectation that the innocent party will rely on the misrepresentation or concealment, (3) actual or constructive knowledge of the true facts by the wrongdoer, and (4) detrimental reliance." (citing *General Elec. Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir. 1994)); *In re 80 Nassau Associates,* 169 B.R. 832, 842 (Bankr. S.D.N.Y. 1994) ("The elements of equitable estoppel are (1) a material misrepresentation, (2) reliance and (3) damage.") (citing *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993)). "The misrepresentation must be one of fact, and an opinion or misrepresentation of law will not suffice." *In re Zarro*, 268 B.R. at 722 (citing *Lignos v. United States*, 439 F.2d 1365, 1368 (2d Cir. 1971); *In re Chateaugay Corp.*, 156 B.R. 391, 403 n. 16 (S.D.N.Y.), *aff'd*, 10 F.3d 944 (2d Cir. 1993); 57 N.Y.Jur.2d, Estoppel, Ratification & Waiver § 13, at 24 (2000)). "Further, the innocent party's reliance must be reasonable." *In re Zarro*, 268 B.R. at 722 (citing *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995); *Petrelli v. City of Mount Vernon*, 9 F.3d 250, 256 (2d Cir. 1993)).

Both of these doctrines apply in this case. As to waiver, Robins' repeated, affirmative, written consent to non-dischargeability unquestionably constituted "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it," to quote the New York Court of Appeals in *City of New York v. State*. It is equally clear that equitable estoppel applies to the facts here, because "the enforcement of rights of one party [Robins' right to discharge and the right to

litigate the issue] would create injustice to the other party who has justifiably relied on the words or conduct of the party against whom estoppel is sought," to quote the Second Circuit in *OSRecovery, Inc. v. One Groupe Int'l, Inc.*

Tribeca's reliance on Robins' waiver of his right to a discharge of his debt to Tribeca is beyond argument. Tribeca had two litigation strategies to try to ameliorate the consequences of the unsecured status of its loan, Robins' sale of the Property mortgaged to secure the loan and his disposition of the proceeds — one was to attempt to recover the $1.3 or $1.4 million of the proceeds held by the Chapter 7 Trustee through the Case Dismissal Motion, and the other was to obtain a judgment of non-dischargeability to the extent that it failed in the Case Dismissal Motion. Having achieved the non-dischargeability objective by reason of the formal entry of Robins' default on August 13 and, far more important, written confirmation in the August 4 letter of Robins' consent to non-dischargeability, Tribeca abandoned its Case Dismissal Motion, consented to the Interim Distribution Motions resulting in distribution of just under $1 million of the sale proceeds and agreed to the Settlement Stipulation formally withdrawing the Case Dismissal Motion with prejudice.

To even suggest that Tribeca's reliance on Robins' consent was not justified would impugn the integrity of not only Robins but his attorney, Bruce Alter, by implying that Mr. Alter's August 4 letter confirming Robins' consent was a deceit and should not have been relied upon to constitute the waiver of dischargeability which it clearly did constitute. Nor is Tribeca's reliance undermined by Mr. Alter's email to Tribeca's counsel in the afternoon of September 9 saying that Robins wanted to change his mind on the default. By September 9, the day before the hearing on the Interim Distribution Motions, Tribeca had already agreed to a full settlement with the Trustee (the Stipulation of Settlement was signed on September 10) and it could no longer object to the Interim Distribution Motions. Robins did not file any paper opposing entry of his default until October 10.

Robins attempts to justify reneging on his written consent to non-dischargeability by arguing that the only reason he consented was lack of funds to litigate the issue and his only reason for reneging was the sudden appearance of a generous attorney friend who would litigate for free. Assuming

that one were to accept these assertions on their face, this would not change the **fact** of Robins' waiver or the **fact** that Tribeca changed its position based upon the waiver. "It is immaterial that there is no actual attempt to defraud or mislead. Rather, the party against whom estoppel is asserted had to intend, or at least expect, that another would act based upon its representation." *In re 80 Nassau Associates,* 169 B.R. at 842 (Bankr. S.D.N.Y. 1994) (internal citations omitted). Robins and his attorney would have had to be naive indeed (and the trier of fact gullible in the extreme) not to recognize that Tribeca would and did change its position based on Robins' consent.

Moreover, the facts suggest a more tactical and strategic, if not cynical, view of Robins' conduct. Robins owed very large tax debts. The $1,749,000 sale proceeds was his only source of payment of his tax debts, which could not be discharged in a bankruptcy. The sale proceeds could be used to pay either Robins' debt to Tribeca or his non-dischargeable debt to the taxing authorities, but not both. Had Robins and his attorney perceived that Robins' interests would be better served by using the sale proceeds to pay the Tribeca debt, it would have been a simple matter to pay the proceeds to Tribeca and wait the ninety day preference period before filing for bankruptcy.

But Robins and his attorney obviously concluded that his interests would be better served by using the sale proceeds to pay off his non-dischargeable tax debts. As acknowledged in paragraph 12 of his affidavit, it was clear to Robins that

> if I did not accept the "settlement" [under which Robins would have to consent to non-dischargeability of his Tribeca debt] that I would have to fully litigate not only this non-dischargeability adversary proceeding, but also the Case Dismissal Motion containing a request to impose an equitable lien on the sale proceeds.

It was also clear to Robins that the objective of Tribeca's Case Dismissal Motion and equitable lien on the sale proceeds was to preclude his use of the sale proceeds to pay off his tax debts. Since Robins' objective was to get his non-dischargeable tax debts paid, he consented to non-dischargeability of his Tribeca debt, and Tribeca then consented to abandon the Case Dismissal Motion.

It bears repeating that Robins did not disclose his intent to revoke his discharge until after he was guaranteed that the sale proceeds would be used through his bankruptcy to pay off his non-

- 16 -

dischargeable tax debts. Whether Robins' decision to revoke his consent to non-dischargeability was motivated by the remarkable if belated appearance of a free attorney angel or was simply the opportunistic product of tactics and strategy is immaterial. One cannot penetrate the workings of a man's mind, and court decisions must be based upon objective facts. The objective facts here demonstrate the Robins knowingly and intentionally consented to waive his right to contest dischargeability. Tribeca justifiably relied on that waiver and it, in turn, then relinquished its attempt to obtain the Property sale proceeds for itself by consenting to the Interim Distribution Motions and withdrawing the Dismissal Motion in the Stipulation of Settlement. Robins benefitted by Tribeca's actions, as he was then guaranteed that the Property sale proceeds would be used to discharge his non-dischargeable tax debts. Under well-established principles, Robins is estopped by his conduct to revoke his consent to non-dischargeability.

## **Orders**

Counsel for Tribeca is directed to submit orders (i) vacating the October 27 Order and (ii) granting judgment on the Default Judgment Motion.

Dated:  White Plains, NY
        January 16, 2009

                                                /s/Adlai S. Hardin, Jr.
                                                       U.S.B.J.